MEMORANDUM OF DECISION
This memorandum of decision addresses petitions brought to terminate the parental rights (TPR) of Ana C. and Jacob R., Sr. (Jacob Sr.), the biological parents of the minor child Jacob R., who was born on March 1994. The Department of Children and Families (DCF) filed the TPR petitions on May 22, 2000. The original petition against Ana C. alleges abandonment, failure to rehabilitate, and no ongoing parent-child relationship. As pursued at trial, the petition against Jacob Sr. alleges abandonment and no ongoing parent-child relationship. For the reasons stated below, the court finds these matters in favor of the petitioner.
The evidence reflects that Jacob came into DCF's care through an Order of Temporary Custody (OTC) issued on May 17, 1996. (Vertefeuille, J.) On August 14, 1996, following a hearing, the court found Jacob R. to be a neglected child[2] and committed him to DCF's custody for a period of twelve months. (Reifberg, J.) Jacob has remained in DCF custody since that date, pursuant to court-ordered extensions of commitment. On August 11, 1999, after hearing, the court (Doherty, J.) found that reunification efforts were no longer appropriate for either parent.[3]
Trial of this highly-contested matter was held on June 12, 13 and 15, 2001. The petitioner and the respondent parents attended all evidentiary sessions: the parties and the child[4] were vigorously represented by counsel throughout the proceedings. Counsel for the petitioner, Ana C. and the child filed thorough and thoughtful post-trial briefs on or before July 27, 2001.[5]
The Child Protection Session of the Superior Court, Juvenile Matters, has jurisdiction over this case. No action is pending in any other court affecting custody of Jacob R.
 I. FACTUAL FINDINGS
The Court has thoroughly reviewed the verified petitions, the TPR social study and addendum,[6] and the multiple other documents submitted in evidence, including records of treatment providers, psychological evaluations and other records. The court has utilized the applicable legal standards in considering this evidence and the testimony of trial witnesses, who included DCF social workers, two psychologists, Jacob's therapists, treatment workers, and both respondent parents.[7]
CT Page 13264 Upon deliberation, the court finds that the following facts were proven by clear and convincing evidence at trial:
I.A. ANA C., THE MOTHER
Ana C. was born on April 3, 1978. She was sexually abused by her maternal grandfather. She left school in the eighth grade, at age fourteen, when she became pregnant with Jacob, and has obtained no further formal education. Ana C. has been employed in fast food restaurants, in retail stores, doing factory work, and as a phone operator, but has had long periods of unemployment. Ana C. commenced using heroin and became opiate dependent in her teens. She began a methadone program after Jacob's neglect adjudication in 1996. (Exhibits 1, 17, 18.)
Ana C. and Jacob Sr. lived together until approximately two months after Jacob's birth on March 1994. Ana C. left Jacob Sr. due to his domestic violence. (Exhibit 1.) Ana C. then allowed her mother, Norma S., to serve as Jacob's caretaker, although Norma S.'s home provided an unacceptable physical environment for a toddler. (Exhibit 2.) In May 1996, when Jacob was two years old, DCF received a public school referral indicating that Ana C. was involved with drugs and prostitution. (Testimony of Maria A.) As Ana C. could not be located, a 96-hour hold was executed, and DCF obtained an OTC for the child in May 1996. (Exhibit 2; Testimony of Maria A.) From May through October of 1996, DCF made several referrals so Ana C. could undergo drug detoxification and obtain substance abuse treatment: however, Ana C. failed to participate. She inconsistently visited with her son during this period. (Testimony of Maria A.)
On August 14, 1996, the court adjudicated Jacob to be a neglected child, and he was committed to DCF custody. From November 1996 through April 1997, DCF had no contact with Ana C., who had moved her residence to Puerto Rico in order to attend to personal matters. In May 1997, upon her return to Connecticut, Ana C. visited Jacob. (Exhibit 1; Testimony of Maria A.; Ana C.) However, her whereabouts were again unknown to DCF from August 1997 to August 1999. (Exhibit 1.)
On August 8, 1999, Ana C. gave birth to a daughter, Savannah G.[8] On August 11, 1999, the court found that no further reunification efforts were appropriate for Ana C. and her son, Jacob. (Exhibit 2.)
During the summer of 1999, upon DCF's referral, Ana C. received residential substance abuse treatment at the Morris Foundation's Women and Children's Program (MF-WAC). Ana C. failed to comply with program rules, and continued to use drugs while enrolled. As a result, she was terminated from MF-WAC in September 1999. (Exhibit 1.) CT Page 13265
In an additional effort to assist Ana C. with her substance abuse issues, DCF referred her to the Family Ties program in the summer of 2000. Although Ana C. was enrolled in multiple parenting programs and received reminders from the Family Ties case manager, she attended only six scheduled sessions. She failed to adequately attend to the five week parenting class and ongoing support groups to which she was assigned, and failed to communicate with the program or DCF. In the fall of 2000, Family Ties closed Ana C.'s file, citing her refusal to participate in services and non-completion of treatment goals. (Exhibits 6, 7, 8, B; Testimony of Lorraine P.)
In July 2000, Ana C. underwent a court-ordered evaluation by Dr. Julia Ramos-Grenier, a skilled and experienced psychologist. Testing revealed that Ana C. is of low-average intelligence, able to understand intellectually what she would have to do to accomplish a goal such as developing control over her substance abuse or learning parenting skills. Her character traits indicate impulsivity, immaturity, suspiciousness of others, unstable moods, and "antisocial personality features [which] suggest a long-standing, continuing pattern of problems with anger." (Exhibit 17; Testimony of Dr. Grenier.) When Dr. Grenier re-evaluated Ana C. in October 2000, she found little change from the psychological conditions noted in July. (Exhibit 18.)
In November 2000, Ana C. requested resumption of visitation with her son:[9] DCF denied this request in view of the recent resurgence of Jacob's behavioral problems, and his therapist's expressed concerns that reintroduction to his mother would be unduly disruptive. (Exhibit 2; Testimony of Julie G.) In March 2001, Ana C. requested an administrative hearing concerning her desire to visit with Jacob and to receive information concerning his emotional and medical status. The request was denied in view of the pending TPR issues. (Exhibit A.)
In early 2001, Ana C. returned to the Connecticut Counseling Center (Connecticut Counseling), where she had previously received substance abuse treatment. She attends group therapy twice monthly to deal with her chronic substance abuse issues. (Testimony of Winifred C.) In the first part of 2001, Ana C. used Percocet and Vicodin, ostensibly procured through her dentist: she thereby violated Connecticut Counseling's protocol that required prior approval of narcotic use. Ana C. still requires methadone maintenance. (Exhibit 13; Testimony of Winifred C.)
I.B. ANA C.'s CRIMINAL HISTORY
In the years following Jacob's birth, Ana C. was convicted and sentenced for prostitution, relating to an offense in July 1996; for sale CT Page 13266 of narcotics, relating to an offense in June 1998; and for violation of probation, relating to an offense in March 1999. On March 30, 2000, Ana C. was convicted of risk of injury to a minor, as noted above: she was sentenced to serve three years, suspended, with five years of probation. Although Ana C. has been released after each conviction, she has also been held for long periods in lieu of bond. (Exhibit 17.)
I.C. JACOB SR., THE FATHER
Jacob Sr. was born April 12, 1972. He left school after the tenth grade, and has no further formal education. He has been employed as a laborer, factory worker, machine and forklift operator, and has also had periods of unemployment. In addition to Jacob, Jacob Sr. is the father of a daughter who is deceased, and another son, Joshua: this youngest child is presently living in Massachusetts with Jacob Sr., his girlfriend of eight years, and another child. Jacob Sr. has been convicted and incarcerated for drug distribution. (Exhibits 1, 19; Testimony of Dr. Grenier.)
In late 1996, Ana C. advised DCF that Jacob Sr. was living in New Jersey. Jacob Sr. initially came to Connecticut to visit his son in January of 1997, and then visited occasionally through September 1998.[10] (Exhibit 19; Testimony of Maria A.) In October 1998, at Jacob Sr.'s request, the child was placed with Jacob Sr.'s mother, Maria R., in Massachusetts. (Exhibit 1; Testimony of Maria A.) During this placement, Jacob Sr. had unsupervised contact with the child despite DCF's instructions to the contrary. (Exhibit 1.) This respondent last saw his son in October 1999, when DCF removed the child from Maria R. and returned him to Connecticut. Jacob Sr. had no contact with DCF from October 2000 to May 2001. Jacob Sr. has never sent any cards, letters or other correspondence to Jacob, and has given gifts on rare occasion. (Exhibits 1, 2; Testimony of Maria A., Tamara B. Velda P.)
In February 2001, Dr. Grenier performed a court-ordered psychological evaluation of Jacob Sr. Testing revealed that Jacob Sr. has traits of insecurity, failure to take responsibility for his own problems, and a limited ability to deal with stress. As Dr. Grenier observed, "having a low frustration tolerance, his mood may quickly change to annoyance or anger . . ." (Exhibit 19.) The psychologist recommended that Jacob Sr. undergo individual counseling for his overt anger and his underlying substance abuse issues. (Exhibit 19.)
I.D. JACOB R., THE CHILD
Jacob was born on March 1994. He entered foster care at age two, and is CT Page 13267 now seven-and-a-half years old. Despite his friendly and endearing aspects, it is clear that Jacob has serious behavioral and cognitive challenges, manifest through delayed development of speech and motor skills, distractibility, impulsivity, oppositionality, physical aggression, severe tantrums, enuresis, encopresis, auditory and visual hallucinations, and fire-setting. Jacob has been placed with his paternal grandmother, in multiple foster homes and a temporary shelter: his moves from these residences were occasioned, in some measure, by the need for professional control of his sleep disorders and non-compliant behavior. (Exhibits 11, 15; Testimony of Tamara B.)
Jacob has been diagnosed with Disruptive Behavioral Disorder, Depression and Attention Deficit/Hyperactivity Disorder: he takes Adderall and Risperidone for his behavioral symptoms. (Exhibits 10, 15.) From February 2000 to May 2001, Jacob resided at Wheeler Clinic's Family Living Home (WC-FLH), in a children's group home residence. Even in this setting, Jacob continued to demonstrate verbal and physical aggression toward his peers and staff members. His behavior has often been so out of control, involving throwing chairs and other objects at adults, that restraints were been required to protect Jacob and others from harm.[11]
Despite some periods of improvement in his overall ability to succeed with the instrumental activities of daily living, Jacob has significant special emotional needs which require exquisite care and supervision of his mood instability and behavioral dyscontrol. In August and September of 2000, at DCF's request, Jacob was evaluated by Christine McN., Psy.D., a clinical psychologist at Wheeler Clinic who is experienced in the treatment and assessment of children. (Exhibits 14, 15.) Dr. McN.'s thorough and objective assessment revealed that Jacob has average intelligence, yet functions only at the level of a three and a half year old, due to "the impact of social, emotional, and behavioral problems, as well as environmental stressors."[12] (Exhibit 15.) She also found Jacob affected by developmental coordination disorder and chronic "complex Post-Traumatic Stress Disorder that is complicated by [his] deficits in motor inhibition and expressive communication." Dr. McN. made specific recommendations for behavioral management and constant adult supervision, both critical to Jacob's well-being. (Exhibit 15.)
These recommendations were instituted at WC-FLH, where one-on-one staffing was available. While periods of escalated behavior problems continued, with professional assistance, Jacob began to develop the ability to control his frustration and aggression. (Exhibit 10.) His Wheeler providers concluded that Jacob should be placed at a private home, where he would be the sole child in the family. Such a setting would mitigate Jacob's problems with attachment and his unpredictable reactions to external stimuli would be reduced, as he would be isolated CT Page 13268 from the tumult intrinsic to residence with other children. (Exhibit 11; Testimony of Dr. McN.)
In February 2001, Wheeler Clinic identified a foster family for Jacob, with no other children in the home. The foster parents received training at Wheeler Clinic, learning specialized methods for the behavioral management of Jacob's special psychological needs. After several months in which both foster parents and the child participated in a mutually successful transition experience, Jacob was discharged from WC-FLH and placed in his new foster home. In this environment, Jacob's behavior problems have decreased, although he continues with the adjustment process. Jacob is comfortable, secure and happy in this foster home: his foster parents wish to adopt him. (Exhibit 2; Testimony of Velda P., Julie G.)
 II. ADJUDICATION
At the adjudicatory phase of these proceedings,[13] the court considered the evidence related to circumstances and events prior to May 22, 2000, the date upon which the TPR petitions were filed, insofar as the allegations pertaining to abandonment and lack of an ongoing parent-child relationship are concerned.[14] As to the allegations of failure to achieve rehabilitation brought against Ana C., the court has also considered the evidence and testimony relevant to circumstances through the close of trial.[15] Upon review, as discussed below, the court has determined that statutory grounds for termination exist as to both respondents.
II.A. LOCATION AND REUNIFICATION EFFORTS
The court finds that the petitioner has met her burden of proving, by clear and convincing evidence, that reasonable efforts[16] were made to locate and reunify Ana C. and Jacob Sr. with their child Jacob.[17] As noted above, the court determined at a hearing held August 11, 1999 that further efforts at reunification would not be appropriate for either respondent. § 17a-112 (c)(1). The array of services provided to Ana C. are set forth in Parts I.A., II.B.2. and III.A.1. As described in Parts I.C. and III.A.1., visitation services were provided to Jacob Sr. while the child lived in Connecticut.[18] Other than visitation, services were not extended to Jacob Sr., in response to his consistent indication that he could not serve as a placement resource for this child.[19] Based on the clear and convincing evidence produced at trial, the court here finds that both Ana C. and Jacob R. are either unable or unwilling to benefit from reasonable reunification efforts.
II.B. STATUTORY GROUNDS FOR TERMINATION — ANA C., THE MOTHER
CT Page 13269
II.B.1. ABANDONMENT — § 17a-112 (c)(3)(A)
As its first ground against Ana C., the petitioner alleges that this respondent abandoned Jacob within the meaning of § 17a-112 (c)(3) (A). Applying the requisite legal standards,[20] the court finds this matter in favor of the petitioner.
During the four years between Jacob's commitment and the filing of the TPR petition, Ana C. was, for all practical purposes, physically and emotionally absent from her son's life. While she visited Jacob during his early months in foster care, Ana C.'s contact with the child and DCF became increasingly sporadic as time passed, and could not be restored. As indicated in Part I.A., Ana C. lived in Puerto Rico from late 1996 through spring 1997: she had no contact with Jacob or DCF during this period. After May 1997, Ana C. unilaterally suspended her visits with the child, and ceased contact with DCF as well; from August 1997 to August 1999, her location remained unknown to DCF. (Exhibit 1; Testimony of Maria A.) Aria C. did not request resumption of visits until November 2000, three-and-a-half years after her last interpersonal contact with Jacob. Moreover, she did not send any cards, letters or gifts to the child until December 1999, when she tendered a Christmas gift for him. (Testimony of Maria A., Tamara B., Velda P.) Such infrequent visitation and inconsistent demonstration of interest in the child's welfare, with a scant display of love or affection, and minimal personal interaction with the child is aptly characterized by Jacob's counsel as an "insignificant"[21] degree of parental interest, which constitutes abandonment for TPR purposes. In re Deana E., supra, 61 Conn. App. 193.
When the adjudicatory date of May 22, 2000 is applied, and even if the court considers efforts Ana C. made thereafter to show an interest in Jacob, it is clear that this respondent has failed the test of meeting "[t]he commonly understood obligations of parenthood" identified In reDeana E., supra, 61 Conn. App. 193. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has met her burden of proving that Ana C. abandoned Jacob, within the meaning of § 17a-112 (c)(3)(A).
II.B.2. PARENTAL FAILURE TO REHABILITATE — § 17a-112 (c)(3)(B)(1)
The petitioner next alleges that Ana C. failed to achieve rehabilitation, supporting the application for termination of her parental rights pursuant to § 17a-112 (c)(3)(B)(1).[22] The evidence clearly establishes that Jacob was adjudicated a neglected child in May 1996. However, Ana C. counters that she has progressed in her CT Page 13270 recovery from substance abuse and parenting deficiencies, so that she is able to resume a responsible role in Jacob's life. She further claims that because formal specific steps were not assigned, she had no objective method for measuring her own efforts at rehabilitation, and therefore cannot be found to have failed to reach any goal. Applying the requisite legal standards,[23] the court finds this issue in favor of the petitioner.
The evidence clearly and convincingly establishes that Ana C. has failed to achieve a level of rehabilitation which would reasonably encourage the belief that at some future date she can assume the role of the primary caretaker for Jacob. In re Sarah Ann K., supra,57 Conn. App. 448. It is uncontroverted that Ana C. has a history of addiction to heroin. (Testimony of Ana C., Winifred C.) Her primary rehabilitation issues, all apparent at the time of Jacob's OTC hearing and neglect adjudication, thus centered upon her obvious substance abuse, limited ability to make responsible judgments about the child's care and safety, and insufficient parenting skills. Immediately following the OTC hearing in May 1996, Ana C. was provided with a series of opportunities to learn and practice appropriate parenting skills, and to become rehabilitated from her substance abuse issues: however, she repeatedly failed to make good use of the proffered programs. As noted in Part I.A., from May through October 1996, DCF afforded Ana C. resources for drug use treatment, but she did not cooperate. From late 1996 through spring 1997, Ana C. made herself unavailable for services in Connecticut, as she had moved to Puerto Rico, and she could not be reached by DCF for the following two years, until Savannah was born. (Exhibit 1; Testimony of Maria A., Ana C.)
As reviewed in Part I.A., Ana C.'s subsequent participation with rehabilitation services has been lackluster, at best. She briefly attended the ME-WAC residential program for palliation of her heroin addiction and parenting deficiencies, but was discharged in September 1999 for noncompliance, before she could benefit from the proffered services. Ana C. also failed to attend appointments that had been scheduled for her at the Star Program and at Connecticut Valley Hospital, and thus was unable to obtain the substance abuse treatment, counseling, and parenting education available through those agencies. (Exhibit 1.) After the submission of the TPR petition, and following Dr. Grenier's evaluation of Ana C. in July 2000, Ana C. was referred to Family Ties for yet another effort at developing parenting skills and achieving substance abuse rehabilitation. However, she again failed to comply with the program's reasonable requirements, and therefore was terminated from this program, as well. (Exhibit B; Lorraine P.)
Although Ana C. has recently paid some attention to her substance abuse CT Page 13271 issues through the programs sponsored by Connecticut Counseling, she has not completed her rehabilitation. She still requires group therapy and supervision by this provider, and has yet to be weaned from methadone maintenance. (Testimony of Ana C., Winifred C.) Ana C.'s use of opiates during early 2001, without adequate explanation and in violation of Connecticut Counseling's rules,[24] confirms that this respondent has not yet achieved functional ability to withstand the temptations of narcotic abuse, and that she has not achieved control over her drug dependency.[25] Further supporting the conclusion that Ana C. has not achieved rehabilitation, the court notes the series of criminal convictions that has followed Jacob's entry into DCF's custody. As noted in Part I.B., Ana C. committed the crimes of sale of narcotics, violation of probation, and risk of injury to a minor following Jacob's neglect adjudication. These criminal acts were not consistent with Ana's claim that she was effectively engaged in the rehabilitation process during recent years, and instead reflect her failure to develop a drug-free lifestyle, while continuing to engage in illegal activities. As she did not achieve rehabilitation from her substance abuse issues despite past referrals to agencies such as MF-WAC and Family Ties, has gone for long periods of time without any documented drug treatment, is still willing to violate the rules of her current substance abuse treatment provider, and has shown no interest in or ability to acquire the skills necessary to properly deal with Jacob's behavioral issues, the clear and convincing evidence reflects that Ana C. has not achieved the level of functional rehabilitation that would enable her to provide this child the intensive parenting care and management he needs. In re Sarah Ann K., supra,57 Conn. App. 448. Even if she had "demonstrated some efforts and had taken some steps toward rehabilitation, those efforts were too little and too late." In re Sheila J., 62 Conn. App. 470, 481, ___ A.2d ___, (2001).
Section 17a-112 (c)(3)(B) also requires the court to analyze whether Ana C. has achieved a level of rehabilitation which allows it to reasonably foresee that, within a reasonable time in the future, she will be able to serve as a responsible, effective caretaker for Jacob. In reAshley S., supra, 61 Conn. App. 665; In re Sarah Ann K., supra,57 Conn. App. 448. Several additional aspects of the evidence support the conclusion that this respondent will not achieve the capacity to responsibly parent Jacob in the foreseeable future. Ana C. is not now ready or able to focus on a child with special needs, as she must still pay primary attention to the process of coping with her own substance abuse problems. In addition to her substance abuse and criminal histories, Ana C. also has a number of unresolved personality issues, including impulsivity, immaturity, and instability. These psychological conditions are largely inconsistent with effective parenting even when a well-child is concerned: as Dr. Grenier persuasively explained, Ana C.'s CT Page 13272 problems with anger and self-interest and her personality profile would severely restrict her ability to adequately parent a child who is physically aggressive and suffers from significant emotional dysfunction, such as Jacob.[26] As Dr. Grenier further stated, given this respondent's inherent psychological traits, placement of Jacob with Ana C. would likely have an adverse effect upon both the child and the mother. (Testimony of Dr. Grenier.) Thus, although Ana C. had made some improvement in her ability to care for herself between Dr. Grenier's first evaluation in July 2000 and the follow-up assessment in October 2000, this evidence presented an inadequate basis for inferring that Ana C. could achieve the ability to care for an emotionally fragile child like Jacob.[27]
Ana C. argues that the petitioner cannot prove the statutory ground of failure to rehabilitate in the absence of specific written steps against which the progress of rehabilitation can be measured. This argument is fatally flawed in several respects. First, the evidence clearly and convincingly reflects that Ana C. was given specific steps by the court, and that the respondent understood exactly what was expected of her in the course of the rehabilitation process.[28] (Testimony of Ana C.) Even if Ana C.'s recollection is faulty, and she was not given written expectations, it is clear that she had actual notice of what she would need to do to achieve reunification with her son. Under these circumstances, demanding evidence of recorded expectations would unnecessarily elevate form over substance, a step this court is loath to take. Second, the Appellate Court has consistently held that when adjudging a respondent parent's degree of rehabilitation, consideration of "steps" is not required.[29] In re Vincent D., 65 Conn. App. 658,670, ___ A.2d ___ (2001); In re Sarah Ann K., supra, 57 Conn. App. 445. Third, the court notes that the petitioner has alleged § 17a-112 (c) (3)(B)(1) against Ana C. The respondent apparently assumes that this section, like § 17a-112 (c)(3)(B)(2), requires the petitioner to prove that Ana C. had "been provided specific steps to take to facilitate the return of this child to the parent. . . ." (Emphasis added.) §17a-112 (c)(3)(B)(2). As has been thoughtfully reasoned in another termination case, "[t]he legislative mandate of § 17a-112 (i) to construe the provisions of the termination "liberally . . . in the best interests of any child for whom a petition under this section has been filed' and the drafting history of P.A. 98-241 firmly support the conclusion that specific steps need not be provided where the basis of a failure to rehabilitate claim is a prior adjudication of neglect. See, e.g., JD-JM-40 (Rev. 6-68), p. 4." In re Marcus Anthony R., Superior Court for Juvenile Matters, Child Protection Session (Frazzini, J.; June 28, 2001). For all these reasons, in the present case, where failure to rehabilitate has been clearly alleged under the provisions of § 17a-112
(c)(3)(B)(1), not § 17a-112 (c)(3)(B)(2), the court declines to CT Page 13273 impose the requested constraints upon the petitioner.
In its totality, the clear and convincing evidence compels the conclusion that Ana C. has failed to achieve a level of rehabilitation which would reasonably encourage the belief that at some future date she could assume the role of the primary caretaker for her son, given his particular emotional and social needs. In re Sarah Ann K., supra,57 Conn. App. 448. Accordingly, the court finds, by clear and convincing evidence, that the petitioner has proved this respondent's failure to achieve § 17a-112 (c)(3)(B)(1) rehabilitation.
II.B.3. LACK OF ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112(c)(3)(D)
The petitioner next alleges that because there is no ongoing parent-child relationship between Ana C. and Jacob, this respondent's parental rights should be terminated pursuant to General Statutes §17a-112 (c)(3)(D).[30] Applying the requisite legal standards,[31]
the court finds this matter in favor of the petitioner.
The court must first determine whether a parent-child relationship exists between Ana C. and her son. In re Jonathon G., supra,63 Conn. App. 525. In so doing, the court adopts and applies the findings related to abandonment, set forth in Part II.B.1. From this, it is clear Ana C. ceded Jacob's care to her mother, Norma S., early in the child's life. Then, and after DCF obtained his custody, others have provided for Jacob's physical, emotional, moral and educational needs, and Ana C. has not served her son in a maternal capacity. § 17a-112 (c)(3)(D).
In discerning the existence of a parent-child relationship, the court must also determine whether Jacob maintains any present positive feelings for Ana C. In re Jonathon G., supra, 63 Conn. App. 525. The uncontested evidence in this case reflects that Jacob has no expressible memories of Ana C. and does not remember her as being his mother.[32] (Exhibit 2; Testimony of Maria A., Dr. McN., Julie G.)
As the clear and convincing evidence thus reflects that no parent-child relationship exists between Ana C. and Jacob, the court must next assess whether it would be detrimental to the child's best interests to allow additional time for such a relationship to develop. In re Jonathon G.,
supra, 63 Conn. App. 525. As noted in Part I.D., Jacob faces numerous, serious psychological challenges. Despite medication, psychotherapy, and skilled social management, it has been extremely difficult for Jacob to comport himself in a compliant, cooperative manner.[33] Jacob requires explicit non-verbal methods of communication and one-on-one attention, to ensure his safety and to better his chances for developing workable CT Page 13274 social and speech skills. (Exhibit 15.) As Dr. McN. observed, this child's behavioral problems are sufficient to "stretch the resources" of even persons who are trained to care for children with cognitive and mental illnesses. (Exhibit 15.)
Ana C. has no special training in child care, and no education or skills which could enable her to provide the intense supervision, special education or sophisticated behavioral management that is obviously vital to Jacob's health and safety. Ana C. has presented no plan for the child's care if he is returned to her custody, and has identified no respite or support system or mental health system which would enhance his care. Furthermore, given Ana C.'s difficulties in achieving rehabilitation, as discussed in Part II.B.2., although Ana C. may be in the early stages of recovery from heroin abuse, she has a long way to go before she can establish her ability to live free from drug dependence. Under all these circumstances, the court must conclude that it would be detrimental to Jacob's best interests to allow additional time for a parenting relationship to be developed with his biological mother. In reJonathon G., supra, 63 Conn. App. 525.
Ana C. protests that her lack of an on-going relationship with Jacob was caused by his long commitment to DCF, the agency's provision of inadequate services, and the limited options available for resolution of her problems. Such argument must be rejected in this case, as in In reShane P., 58 Conn. App. 244, 256, ___ A.2d ___ (2000). "Here, the respondent's behavior, not the conduct of the department, prevented the development of a relationship with [Jacob]." In re Amelia W.,62 Conn. App. 500, 506, ___ A.2d ___ (2001). See also In re Deana E.,
supra, 61 Conn. App. 193. In the present case, Ana C. has been offered multiple appropriate rehabilitation services, as part of the agency's reasonable efforts to help her develop a meaningful relationship with her son, as discussed earlier. Instead of fully utilizing these services, and achieving control over her substance abuse issues, Ana C. lapsed into non-compliance for months at a time, and spent long periods in pre-trial incarceration, all the while failing to maintain any measurable relationship with young Jacob. On other occasions, as noted, she left the child to attend to her own affairs in Puerto Rico, or merely ceased contact with him or DCF, discontinuing all written communications or phone calls. Thus, as in Shane P., the result of the respondent mother's conduct is that this child has no present feelings for or memories of her in a maternal role, and that he views a prior foster mother as his mother. In re Shane P., supra, 58 Conn. App. 241.
"It is reasonable to read the language of no ongoing parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship CT Page 13275 has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." (Citations omitted.) In re John G., supra,56 Conn. App. 22. This observation applies to the present case, where the clear and convincing evidence establishes that any valid parenting relationship that Ana C. may once have developed with Jacob has been definitively lost due to her substance abuse and her absences from the child's life.[34] Thus, as the clear and convincing evidence in this case establishes that no ongoing parent-child relationship exists between Ana C. and Jacob, and that it is not in the best interests of this child to allow more time for him to develop a relationship with his biological mother, the petitioner has met her burden of proof under § 17a-112
(c)(3)(D). In re Jonathon G., supra, 63 Conn. App. 525; In re John G.,
supra, 56 Conn. App. 22.
II.C. STATUTORY GROUNDS FOR TERMINATION — JACOB SR., THE FATHER
 II.C.1. ABANDONMENT — § 17a-112 (c)(3)(A)
As its first ground against Jacob Sr., the petitioner alleges that this respondent has abandoned Jacob, within the meaning of § 17a-112 (c) (3)(A). Applying the legal standards set forth in Part II.B.1., the court finds this matter in favor of the petitioner.
The evidence clearly and convincingly reflects that Jacob Sr. had physically and emotionally abandoned his son within months following the child's birth on March 1994, and that during the next two years he made no effort to communicate with the child.[35] Even in late 1996, when Ana C. informed him of Jacob's placement in foster care, Jacob Sr. indicated only slight interest in Jacob. From January 1997 through October 1998, for instance, Jacob Sr. attended only a handful of visits with his son.[36] He never wrote to him, called him, or sent gifts or mementos for the child, and he consistently maintained the position that he could not serve as a caretaker for Jacob.[37] (Exhibit 1; Testimony of Maria A.) When Jacob resided with his paternal grandmother in Massachusetts from October 1998 through October 1999, he had frequent, albeit often unpleasant, contacts with his father, who utilized corporal punishment and subjected his four year old child to unreasonable physical demands, as further discussed in Part II.C.2. After Jacob was removed from his paternal grandmother, Maria R. in October 1999, Jacob Sr. suspended his contacts with DCF and made no efforts to visit his son for many months. (Testimony of Tamara B.)
In July of 2000, after the TPR petition was filed, DCF called Jacob Sr. to advise him that a new social worker had been assigned to the case. Two weeks later, Jacob Sr. abruptly appeared at a DCF office and CT Page 13276 requested resumption of visits with his son. On this occasion, for the first time, Jacob Sr. also asserted the desire to serve as a placement resource for Jacob. (Testimony of Velda P., Maria A.) DCF reasonably chose not to provide visitation at that time, in view of Jacob's reports of mistreatment by his father, statements that he did not want to have contact with Jacob Sr., and the need to preserve the child's tenuous stability.[38] (Testimony of Maria A.)
In sum, the evidence clearly and convincingly establishes that Jacob Sr. had only a minimal relationship with his son prior to October 1998; he failed to act in an appropriate parenting manner toward Jacob when the child resided with his paternal grandmother; he did not see his son from October of 1999 through May of 2000 when the TPR petition was filed; and he has not seen Jacob since that time. There is no excuse, under the circumstances presented here, for Jacob Sr. to have failed to communicate with his son in writing, through cards or letters, or by sending gifts or mementos, since this respondent claims to have had steady employment. Similarly, no valid basis was presented to explain the reason for the paucity of contact Jacob Sr. maintained with DCF, or his failure to provide financial support for the child: the reason for his lack of communication, logically inferred by the court from his failure to engage in such communication, is that Jacob was rarely on his father's mind.
When the adjudicatory date of May 22, 2000 is applied, the evidence in this matter clearly and convincingly establishes that Jacob Sr. has failed the test of meeting "[t]he commonly understood obligations of parenthood" identified in In re Deana F., supra, 61 Conn. App. 193. Accordingly, based on this clear and convincing evidence, the court finds that the petitioner has met her burden of proving that Jacob Sr. abandoned his son, within the meaning of § 17a-112 (c)(3)(A).
II.C.2. LACK OF ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112(c)(3)(D)
The petitioner next alleges that because there is no ongoing parent-child relationship between Jacob Sr. and his son, this respondent's parental rights should be terminated pursuant to General Statutes §17a-112 (c)(3)(D). Applying the requisite legal standards as set forth in Part II.B.3., the court finds this matter in favor of the petitioner.
As noted above, the court must first ascertain whether a parent-child relationship exists between Jacob Sr. and Jacob. In re Jonathon G.,
supra, 63 Conn. App. 525. In doing so, the court adopts the conclusions set forth in Part II.C.1., establishing that Jacob Sr. has abandoned his son. Thus, it is apparent that others have always met Jacob's physical, emotional, moral and educational needs, as Jacob Sr. has never served CT Page 13277 this child as a valid parent. § 17a-112 (c)(3)(D).
In assessing the existence of a parent-child relationship, the court must also decide whether Jacob maintains any feelings for Jacob Sr. that are of a positive nature. In re Jonathon G., supra, 63 Conn. App. 525. In this case, it is clear that the child has no such memories of Jacob Sr., although he does retain recollections of a negative sort. Jacob complained that in 1999, when he lived in Massachusetts, Jacob Sr. struck the child with a belt and his hands during unsupervised visits. (Exhibits BB, CC; Testimony of Tamara B.) Jacob also recounted occasions Jacob Sr., as a method of discipline, would force the child to kneel and hold his arms outstretched, bearing a heavy can in each hand, for a prolonged period of time.[39] (Testimony of Julie G.) Jacob Sr. sincerely contests the reliability of his son's accusations, and the evidence does reflect that the child may have recanted his original complaints.[40] (Exhibit 19.) Whether or not the allegations can be verified, it is clear that at best, Jacob harbors complex, painful memories of his biological father.In re Jonathon G., supra, 63 Conn. App. 525.
As it is thus apparent that no parent-child relationship exists between Jacob Sr. and Jacob, the court must next assess whether it would be detrimental to this child's best interests to allow additional time for a parenting relationship to be developed. In re Jonathon G., supra,63 Conn. App. 525. As noted throughout this decision, Jacob's significant mental health and behavioral needs mandate that he reside in a home in which he will have constant, consistent access to caretakers who understand and accommodate his psychological needs. (Exhibit 15.) As Dr. McN. explained, Jacob's caretakers must be thoroughly trained in behavior management techniques which are appropriate for responding to Jacob's outbursts and over-reactions. (Testimony of Dr. McN.) Dr. Grenier's testimony supports the conclusion that Jacob Sr. cannot fulfill this role. This psychologist clearly established that Jacob Sr.'s personality structure and emotional template render him unable to provide the requisite level of care for such a demanding and emotionally fragile child: this father's innate insecurity and low frustration tolerance seriously limit his capacity to meet this child's needs. The court also notes that there is no indication that Jacob Sr. has any interest in, or education concerning, the specific psychological management techniques that Jacob requires from the adults who love, nurture, and provide positive discipline for him. (Testimony of Dr. Grenier; see also Exhibit 19 and Testimony of Dr. McN.)
Moreover, the evidence clearly and convincingly reflects that there is at least one young child, Joshua, already living in Jacob Sr.'s home.[41]
(Exhibits 1, 19.) Dr. McN.'s uncontroverted testimony compels the conclusion that Jacob is not likely to thrive, and possibly cannot even CT Page 13278 survive, in a home where another child is also being raised, as Jacob is overly vulnerable to the stimuli which are the logical result of having youngsters reside together. As Jacob's well-being requires him to be the only child in the household, Jacob Sr.'s home offers only a placement that is adverse to this child's well-being. (Exhibit 15; Testimony of Dr. McN.) Even if in-home services were provided to Jacob Sr.'s family, the child's best interests would not be served by reuniting him with his biological father, under these conditions. (Testimony of Dr. Grenier.)
When the court considers the multiple components of Jacob's unhappy recollections of treatment by Jacob Sr., this father's unreasonable absence from his son's life, and the fact that he lacks the parenting and behavior management techniques that are required to properly care for Jacob, the court finds no reasonable basis for concluding that this child's best interests will be served by allowing him to be placed with his biological father. Jacob needs permanency now, so that he can concentrate on developing life skills in a predictable, known environment. The evidence clearly and convincingly reflects that Jacob is well-cared for in his new foster home, where he has had the benefit of stability and comfort for the past several months. The evidence provides no reasonable basis for him to be moved from this placement, or for a parenting relationship to be developed with Jacob Sr. In re Jonathon G.,
supra, 63 Conn. App. 525.
The clear and convincing evidence establishes that any valid parenting relationship that Jacob may have developed with his biological father has been definitively lost due to his lack of positive involvement in his child's life. In re John G., supra, 56 Conn. App. 22. As the clear and convincing evidence in this case establishes that no ongoing parent-child relationship exists between Jacob Sr. and his son, and that it is not in Jacob's best interests to allow more time for him to develop a relationship with his biological father, the petitioner has met her burden of proof under § 17a-112 (c)(3)(D).
 III. DISPOSITION
As the court has concluded that statutory grounds for termination exist, it next "must determine whether termination is in the best interests of the child." (Quotation marks and citation omitted.) In reQuanitra M., supra, 60 Conn. App. 103. In the dispositional phase of this hearing, the court has considered the evidence and testimony related to circumstances and events up to and including the date upon which the evidence in this matter was completed.[42]
III.A. SEVEN STATUTORY FINDINGS
CT Page 13279
The court has made each of the seven written factual findings required by General Statutes § 17a-112 (d) based upon the clear and convincing evidence presented at trial, and has considered the evidence relevant to each of these findings in deciding whether to terminate parental rights.[43]
 III.A.1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112(d)(1)
When she was available to DCF, multiple timely and appropriate services were provided for Ana C., including referrals to MF-WAC, the Star Program, Connecticut Counseling, Connecticut Valley Hospital and Family Ties. (Exhibit I.) As previously discussed, no services other than visitation were tendered to Jacob Sr., because he long rejected designation as a custodian for the child. By July of 2000, when Jacob Sr. proclaimed that he was interested in serving as the child's primary caretaker, nearly a year had passed since the court's August 11, 1999 ruling that reunification efforts were no longer appropriate.
III.A.2. EFFORTS AT REUNIFICATION PURSUANT TO FEDERAL LAW —§ 17a-112 (d)(2)
DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, under the circumstances of this case, where neither parent is able or willing to benefit from reunification, and where the court had previously found that reunification efforts were no longer appropriate.
III.A.3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (d)(3)
The evidence does not reflect any orders that were in effect in this matter.
III.A.4. CHILD's FEELINGS AND EMOTIONAL TIES — § 17a-112 (d)(4)
Jacob has no measurable emotional ties to either respondent. He does not ask for or talk about Ana C. or Jacob Sr., and states that he does not want to visit with them. (Exhibit 1.) He has a warm and comfortable relationship with his foster parents. (Testimony of Velda P., Julie G.)
III.A.5. AGE OF THE CHILD — § 17a-112 (d)(5)
Jacob was born on March 1994, and is seven-and-a-half years old.
III.A.6. PARENTS' ADJUSTMENT OF THEIR CIRCUMSTANCES — § 17a-112CT Page 13280(d)(6)
Neither respondent has maintained adequate contact with DCF, with the foster parents or with Jacob. Given Ana C.'s failed rehabilitation efforts, and the respondents' minimal communications with Jacob, it is clear that they have not made realistic and sustained efforts to conform their conduct to even minimally acceptable parental standards. Giving them additional time would not likely bring their performance, as parents, within acceptable standards so as to make it in Jacob's best interests to be reunited with either one.
III.A.7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAININGRELATIONSHIPS WITH THE CHILD — § 17a-112 (d)(7)
No unreasonable conduct by the child protection agency, foster parents or third parties prevented Ana C. or Jacob Sr. from maintaining a relationship with Jacob.
Ana C. has argued that by denying her March 2001 request for an administrative hearing, DCF unreasonably interfered with her ability to visit with Jacob and to receive information concerning his emotional and medical conditions. However, that this denial was clearly warranted by the circumstances, including the court's August 1999 finding that no further reunification efforts were required involving this respondent; the anticipation of the TPR trial, the long delay between the submission of the TPR petitions in May 2000 and the renewed request for visitation; and the felony convictions Ana C. had recently acquired for risk of injury to a minor.
Jacob Sr. has complained that DCF did not respond appropriately to his request for increased visitation. However, the court notes that although an administrative hearing was scheduled for review of visitation issues on December 12, 1999, neither Jacob Sr. nor Maria R., the paternal grandmother, appeared at that hearing, so no provision was made for visitation at that time. (Testimony of Tamara B.) Any other request Jacob Sr. may have presented for enhanced visitation took place after the court's ruling that no further efforts at reunification were required, and after Jacob's therapists had concluded that reintroduction would be contrary to the child's best interests. (Testimony of Tamara B., Velda P., Julie G.)
III.B. BEST INTERESTS OF THE CHILD — § 17a-112 (c)(2)
The court is next called upon to decide whether termination of the parental rights of Ana C. and Jacob Sr. would be in Jacob's best interests.[44] Applying the appropriate legal standards[45] to the CT Page 13281 facts which are clearly and convincingly apparent in this case, the court finds that termination of their parental interests will best serve the child at issue.
In deciding this issue, the court examined multiple relevant factors including Jacob's special need for stability and continuity in his environment; his lengthy stay in foster care; his comfortable relationship with his current foster parents; his genetic bond with his biological parents and the minimal degree of contact he has maintained with them over the years. In re Savanna M., 55 Conn. App. 807, 816,740 A.2d 484 (1999) (genetic bond between biological parent and his or her child, although not determinative of the issue of the best interests, should be considered). See also In re Alexander C., supra,60 Conn. App. 559; In re Shyina B., supra, 58 Conn. App. 167. In this matter, the court has balanced the child's intrinsic needs for stability and permanency against the value of maintaining a connection with his biological parents. Pamela B. v. Ment, 244 Conn. 296, 313-314,709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against the interest in preserving family integrity).
Under such scrutiny, the clear and convincing evidence establishes that it is not in Jacob's best interests to continue to maintain any legal relationship with the respondents. As this issue has been thoroughly discussed in Parts II.B.3. and II.C.2, suffice it to summarize as follows:
Jacob is a seven-and-a-half year old boy who has been in foster care since age two. He suffers from serious emotional and behavioral problems which have required a high-level of professional supervision, and which have been the subject of mental health treatment for a number of years. He continues to require care by trained, committed and knowledgeable adults in a setting where he is the only child. His current pre-adoptive home offers him the specialized attention and psychological management that has been identified by the experts as best serving his needs. The evidence in this matter clearly and convincingly establishes that while the home in which Jacob currently resides is a very good placement,[46]
neither biological parent is capable of or in a position to meet this child's particular needs.
In urging termination of Ana C.'s and Jacob Sr.'s parental rights, Jacob's counsel has poignantly observed that "[t]his child has languished while a system searched for a stable, permanent placement for him. . . . This child needs to be freed for adoption and given the chance at finding a family which can meet his needs and provide him with the hope of a bright future." Child's Brief. Indeed, our courts have recognized that "[b]ecause of the psychological effects of prolonged termination CT Page 13282 proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930
(1992); see also In re Juvenile Appeal (84-CD), 189 Conn. 276, 292,455 A.2d 1313 (1983). The court fully agrees with Jacob's counsel, Dr. Grenier, and Dr. McN. in finding that this child is entitled to the benefit of ending, without further delay, the long period of uncertainty as to the availability of his biological parents as caretakers. PamelaB. v. Ment, supra, 244 Conn. 313-314.
Balancing Jacob's intrinsic need for stability and permanency, now being met in his foster home, against the benefits of maintaining a relationship with either Ana C. or Jacob Sr., with whom Jacob has so scarce a connection, the clear and convincing evidence in this case establishes that this child should indeed be freed from the legal ties which have bound him to his birth parents. Termination will ensure that Jacob can continue to receive appropriate attention to his special needs from caregivers who have the capacity and commitment to ease his way through the challenges presented by his emotional disorder and behavioral issues, and who will best prepare him for a healthy adulthood.
Accordingly, with respect to the best interests of the child contemplated by § 17a-112 (c)(2), by clear and convincing evidence, and based upon all of the foregoing, including the testimony and evidence presented, the court finds that termination of the parental rights of Ana C. and Jacob Sr. is in Jacob's best interests.
 IV. ORDER OF TERMINATION
WHEREFORE, after due consideration of Jacob's sense of time, his fundamental need for a secure and permanent environment, the relationship he has developed with his current foster parents, and the totality of circumstances; having considered the statutory criteria, found by clear and convincing evidence that grounds exist for termination of parental rights; and concluded that the termination of parental rights will be in this child's best interests, the court ORDERS:
That the parental rights of Ana C. and Jacob R. Sr. are hereby terminated as to Jacob R.
That the Commissioner of the Department of Children and Families is appointed Jacob R.'s statutory parent for the purpose of securing an adoptive family or other permanent placement for him; that primary consideration for adoption of Jacob shall be offered to his current foster parents. CT Page 13283
That a permanency plan shall be submitted within 30 days of this judgment.
BY THE COURT,
N. Rubinow, J.